## No. 17,913.

PUEBLO BUILDING AND CONSTRUCTION TRADES COUNCIL,
ET AL. v. HARPER CONSTRUCTION COMPANY.

(307 P. [2d] 468)

Decided January 28, 1957. Rehearing denied March 11, 1957.

Messrs. HORNBEIN & HORNBEIN, Mr. ROY O. GOLDEN, for plaintiffs in error.

Messrs. SEAVY & SEAVY, for defendants in error.

*En Banc.*

MR. JUSTICE KNAUSS delivered the opinion of the Court.

WE will refer to the parties as they appeared in the trial court where plaintiffs in error were defendants and defendant in error was plaintiff.

Plaintiff is a building contractor and defendant Building Trades Council is an unincorporated group of labor unions whose members are employed in the building and construction industry in Pueblo, Colorado. The other defendants are officers of the Council.

The trial court issued an injunction against picketing of plaintiff's construction operations. The picketing was conducted on the public street leading to plaintiff's project. From the injunctive order defendants bring the case here on writ of error.

The sole questions here presented are defendants' contentions:

(1) " * * * that the trial court erred in holding as a matter of law that defendants had no right to picket in the absence of a 'labor dispute' as defined by the Labor Peace Act. C.R.S. '53, 80-5-2 (7)," and

(2) That peaceful picketing for a lawful objective constitutes the exercise "of the constitutionally protected right of free speech," hence denial thereof is repugnant to the First and Fourteenth amendments of the Constitution of the United States, and Art. II, Sec. 10 of the Constitution of Colorado.

The record discloses that for several years prior to the month of December, 1955, plaintiff, a building contractor, had been engaged in constructing homes in Pueblo. In its operations plaintiff used non-union labor; hence none of the defendants represented any employees of plaintiff, nor was plaintiff involved in disputes with its employees. It purchased supplies for use in its operations from firms whose employees were members of various unions. On December 7, 1955, defendants established a picket line on the public street near the entrance to plaintiff's project at a place where persons going to the project would be most likely to enter. At first there were two pickets so engaged, and later only one man was so occupied. The pickets carried signs reading as follows: "Harper Const. Co. Paying sub-standard wages — Pueblo Building & Construction Trades Council." It is admitted, and the trial court found that the "picketing was peaceful with no coercion or violence of any kind." While the picket was so employed, union drivers and deliverymen for firms and corporations who furnished materials and supplies for Harper refused to cross the picket line to make deliveries. Thus plaintiff's operations were handicapped or halted due to non-delivery of materials.

One witness testified that the Pueblo Bldg. and Construction Trades Council pickets were posted so that deliveries by unionized firms would be stopped, with the ultimate purpose of having plaintiff employ only union labor on its project. Others testified that the purpose of the picketing was to acquaint the public with the fact that plaintiff was paying "sub-standard" wages, thereby "injuring" all unionized employees.

The trial court found that there was no labor dispute between plaintiff and its employees, and "That there therefore exists a very wide differential between the pay given its employees by plaintiff and the prevailing wage as established in the Pueblo area, even if the overtime difference were not so considered." * * * "the Court finds that the evidence would rather support the view advanced by most of those testifying for the defendants to the effect that their own welfare and that of their employers were both being jeopardized by the action of plaintiff in competing with their employers by paying sub-standard wages (in this instance considerably sub-standard) and that such type of competition threatened the whole wage structure as now prevailing and would, if continued, result in great damage both to defendants and to their employers, and could well result in lowering the standard of living for the defendants and that this constituted their dispute with the plaintiff. The court notes that the signs carried by the pickets shows this to have been the dispute between them."

The trial court based its decision exclusively on C.R.S. '53, 89-5-2 (7), holding that no "labor dispute" existed between plaintiff and its employees, and that C.R.S. '53, 80-5-2 (11), prohibits picketing against one not a party to the particular labor dispute. The trial judge was of the opinion that defendants' contention that the injunctive order violated their rights under the Federal and State Constitutions concerning freedom of speech was without merit.

C.R.S. '53, 89-5-6 (2) (f), makes it an unfair labor practice for an employee individually or in concert with others "To hinder or prevent, by mass picketing, threats, intimidation, force or coercion of any kind, the pursuit of any lawful work or employment, or to obstruct or interfere with entrance to or egress from any place of employment, or to obstruct or interfere with free and uninterrupted use of public roads, streets, highways * * * or other way of travel or conveyance."

C.R.S. '53, 80-5-7 (2), excludes from the category of "unfair labor practice" "the right of both employer and employee freely to express, declare and publish their respective views and proposals concerning any labor *relationship*." (Emphasis supplied.)

C.R.S. '53, 80-5-16 (5), provides that no court may issue an injunction in any case involving a labor dispute to restrain "giving publicity to and obtaining or communicating information regarding the existence of, or the facts involved in, *any dispute,* whether by advertising, speaking, without intimidation or coercion, or by any other method not involving fraud, violence, breach of the peace, or threat thereof;". (Emphasis supplied.)

█ The Colorado Labor Peace Act expressly reserves to employer and employee the right to freely " * * * express, declare and publish their respective views and proposals concerning. any *labor relationship*." This is a recognition of the constitutional right of every citizen. The same act makes it an unfair labor practice "by mass picketing, threats, intimidation, force or coercion to hinder or prevent any lawful work or employment." In the instant case there was no mass picketing, and the express finding of the trial court, amply supported by competent evidence, was that there were no threats, intimidation, force or coercion of any kind in connection with the peaceful picketing here complained of.

The Labor Peace Act not only attempts to define a labor dispute but it also lists a number of things denominated "unfair labor practices." These may arise because of conduct on the part of management as well as on the part of employees of a particular employer, or on the part of third parties.

█ In *American Federation of Labor v. Swing,* 312 U.S. 321, the leading case on the subject, the question presented was whether the constitutional guarantee of freedom of discussion was infringed by the common law policy of a state forbidding resort to peaceful persuasion

through picketing merely because there is no immediate employer-employee dispute. It was there said:

"Such a ban of free communication is inconsistent with the guarantee of freedom of speech. That a state has ample power to regulate the local problems thrown up by modern industry and to preserve the peace is axiomatic. But not even these essential powers are unfettered by the requirements of the Bill of Rights. The scope of the Fourteenth Amendment is not confined by the notion of a particular state regarding the wise limits of an injunction in an industrial dispute, whether those limits be defined by statute or by the judicial organ of the state. A state cannot exclude working-men from peacefully exercising the right of free communication by drawing the circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him. The interdependence of economic interest of all engaged in the same industry has become a commonplace. *American Steel Foundries v. Tri-City Council,* 257 U.S. 184, 209. The right of free communication cannot therefore be mutilated by denying it to workers, in a dispute with an employer, even though they are not in his employ. Communication by such employees of the facts of a dispute, deemed by them to be relevant to their interests, can no more be barred because of concern for the economic interests against which they are seeking to enlist public opinion than could the utterance protected in Thornhill's case. 'Members of a union might, without special statutory authorization by a State, make known the facts of a labor dispute, for freedom of speech is guaranteed by the Federal Constitution.' *Senn v. Tile Layers Union,* 301 U.S. 468, 478."

In *Milk Wagon Drivers Union v. Meadowmoor Dairies,* 312 U.S. 287, it was held that where the controversy is attended by peaceful picketing and by acts of violence, and the violence has been such that continuation of the picketing will operate coercively by exciting fear that

violence will be resumed, an injunction by a state court forbidding the picketing as well as the violence does not infringe the Fourteenth Amendment of the Federal Constitution.

*Bakery Drivers Local v. Wohl,* 315 U.S. 769, is a case where members of a union of drivers engaged in the distribution of baked goods, in an endeavor to induce peddlers to work but six days a week and to hire an unemployed union member one day a week, peacefully picketed bakers from which the peddlers obtained their goods and the places of business of the peddlers' customers. They carried placards with the peddlers' names and a true statement of the union's grievance. It was held that a state court injunction against such picketing was an unconstitutional invasion of the right of free speech; that the right of free speech does not depend in such a case on whether or not a "labor dispute" as defined in the New York statutes, is involved. As in the instant case "The controversy in the trial court centered about the issue as to whether a labor dispute was involved within the meaning of N.Y. statutes. The trial court found itself constrained to hold that no labor dispute was involved, and seemed to be of the impression that therefore no Constitutional rights were involved. * * * The trial court refused the petitioners' request for a finding that 'it was lawful for the defendants to truthfully advise the public of its cause, whether in the vicinity of the places of business of bakers who sold to the plaintiffs, or otherwise.' Likewise, it refused a request to find 'that it was a constitutional right of the defendants to advise the public, accurately and truthfully and without violence or breach of the peace, that defendants worked seven days a week, and that the defendants were seeking to secure employment from the plaintiffs for unemployed members of the union, for one day a week.' "

"So far as we can ascertain from the opinions delivered by the state courts in this case, those courts were

concerned only with the question of whether there was involved a labor dispute within the meaning of the New York statutes, and assumed the legality of the injunction followed from a determination that such a dispute was not involved. Of course that does not follow: one need not be in a 'labor dispute' as defined by state law to have a right under the Fourteenth Amendment to express a grievance in a labor matter by publication unattended by violence, coercion, or conduct otherwise unlawful or oppressive. * * * there are no findings and no circumstances from which we can draw the inference that the publication was attended or likely to be attended by violence, force or coercion, or conduct otherwise unlawful or oppressive; and it is not indicated that there was an actual or threatened abuse of the right to free speech through the use of excessive picketing."

As to the peaceful picketing there being considered, the court said: "We ourselves can perceive no substantive evil of such magnitude as to mark a limit to the right of free speech which the petitioners sought to exercise."

In a concurring opinion, Mr. Justice Douglas said: "Its statute (Civil Practice Act, §876 a), as construed and applied, in effect eliminates communication of ideas through peaceful picketing in connection with a labor controversy arising out of the business of a certain class of retail bakers. But the statute is not a regulation of picketing per se — narrowly drawn, of general application, and regulating the use of the streets by all picketeers. In substance it merely sets apart a particular enterprise and frees it from all picketing. If the principles of the Thornhill case are to survive, I do not see how New York can be allowed to draw the line."

In *Thornhill v. Alabama*, 310 U.S. 88, the court said: "The dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution." In that case the court recognized that picketing

could be regulated, but stated: "Abridgement of the liberty of such discussion can be justified only where the clear danger of substantive evils arises under circumstances affording no opportunity to test the merits of ideas by competition for acceptance in the market of public opinion."

 Aside from statutory provisions, the legality of peaceful picketing has its basic roots in constitutional guarantees of liberty and free speech. The duty to prevent encroachment upon these constitutional guarantees rests not only upon the legislature but upon the judicial branch of the government. *Senn v. Tile Layers Protective Union,* 301 U.S. 468; *People v. Harris,* 104 Colo. 386, 91 P. (2d) 989; *Denver Local Union No. 13 v. Perry Truck Lines,* 106 Colo. 25, 101 P. (2d) 436.

In *Denver Local Union No. 13 v. Perry Truck Lines, supra,* it was said: "Counsel for plaintiffs argue that there can be no 'labor dispute' where the sole purpose of the union is to compel an employer to coerce his employees to join a labor union, because an attempt to compel an employer to sign a closed-shop contract against the will of his employees is illegal under sections 76 and 77, chapter 97, supra. We cannot say from this record, that this was the sole purpose of the union. * * * Assuming, however, that this is the sole object of the agencies used by defendants herein to obtain a closed shop, is there any merit to the argument? This same contention was rejected in *Senn v. Tile Layers Protective Union, supra,* and *Lauf v. E. G. Shinner & Co., supra.* It was also rejected in the well-reasoned case of *American Furniture Co. v. I. B. of T. C. & H. of A., supra.*"

The Denver Union No. 13 case was decided prior to the enactment of the so-called Labor-Peace Act of 1943.

In *Denver Union v. Buckingham,* 108 Colo. 419, we said:

"We recently held, in *Denver Union v. Perry Truck Lines,* 106 Colo. 25, 101 P. (2d) 436, that under the State

Norris-LaGuardia Act, a labor dispute as therein defined might exist even though there was no controversy between such employer and his own employees. Also, in that case — presaging the holding of the Supreme Court of the United States in *Thornhill v. Alabama,* 310 U.S. 88, 60 Sup. Ct. 736, 84 L.Ed. 1093 — we held that peaceful picketing had its basic roots in the constitutional guarantees of liberty and freedom of speech. Under these decisions and others of the United States Supreme Court hereinafter cited, there is now no question that a state may not by its common law or statutory policy prohibit peaceful persuasion, through peaceful picketing, notwithstanding the occasioning labor dispute is not an immediate employer-employee one."

In *Carpenters & Joiners Union v. Ritter's Cafe,* 315 U.S. 722, it is said: " * * * recognition of peaceful picketing as an exercise of free speech does not imply that the states must be without power to confine the sphere of communication to that directly related to the dispute. Restriction of picketing to the area of the industry within which a labor dispute arises leaves open to the disputants other traditional modes of communication. To deny to the states the power to draw this line is to write into the Constitution the notion that every instance of peaceful picketing — anywhere and under any circumstances — is necessarily a phase of the controversy which provoked the picketing. Such a view of the Due Process Clause (in the Fourteenth Amendment) would compel the states to allow the disputants in a particular industrial episode to conscript neutrals having no relation to either the dispute or the industry in which it arose."

In the instant case the single picket paraded on the highway adjacent to the operations of plaintiff.

In *Cafeteria Employes Union v. Angelos,* 320 U.S. 293, the court had before it "a prohibition as unrestricted as that we found to transgress state power in *A. F. of L. v. Swing, supra.*" It was there said: "But, as we have

heretofore decided, a state cannot exclude working men in a particular industry from putting their case to the public in a peaceful way 'by drawing the circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him.' "

█ Mr. Justice Jackson, speaking for the Court in *Bakery and Pastry Drivers v. Wohl, supra,* said: " * * * one need not be in a 'labor dispute' as defined by state law to have a right under the Fourteenth Amendment to express a grievance in a labor matter by publication unattended by violence, coercion, or conduct otherwise unlawful or oppressive."

█ In *American Federation of Labor v. Reilly,* 113 Colo. 90, 155 P. (2d) 145 (decided after the Labor Peace Act was adopted), we held that the Supreme Court of the United States is the final arbiter in the field of federal constitutional law and its decisions as to the meaning and scope thereof are binding upon state courts.

The cases of *Denver Milk Producers v. Teamsters Union,* 116 Colo. 389, 183 P. (2d) 529, and *Amalgamated Meat Cutters v. Green,* 119 Colo. 92, 200 P. (2d) 924, were decided under facts distinctly different from those in the instant case. In each of these cases the court determined that the union was picketing for an unlawful objective. It must be conceded in the instant case that the objective of the defendants was by peaceful means to persuade the plaintiff to adopt the prevailing wage rates paid by other employers in the area, by calling attention of the public to its dereliction in that respect. From the exhibits introduced at the trial and the Colorado statutes it is manifest that the defendants were asking nothing from the plaintiff other than that it recognize and pay the wages approved by the municipal, state and federal governments and of the other building contractors in the area. As we said in *Denver Local Union v. Perry Truck Lines, supra:* "The wage scale and working conditions of plaintiffs' operation reflect them-

selves in all like operations. The margin of difference * * * might become an important competitive factor with others in like business, so as to force the adoption of the lower scale by those who employ members of defendant's union."

A careful consideration of *People v. Harris, supra; Denver Union v. Truck Lines, supra; Denver Union v. Buchingham Co., supra,* and the cases from the United States Supreme Court we have cited, convince us that peaceful picketing is a form of free speech and as such protected by constitutional guaranty. To hold otherwise would be to fix a limitation on the right to express views concerning a labor relationship, and, as we think, invade the right of freedom of speech contrary to the explicit provisions of the statute under consideration. As we have pointed out the Act provides: " * * * nor shall anything in this act be so construed as unlawfully to invade the right to freedom of speech." And again, "The right of both employer and employee freely to express, declare and publish their respective views and proposals concerning any labor. *relationship* shall not be abrogated or limited by this act, nor shall the exercise of such right constitute an unfair labor practice." (Emphasis supplied.)

This was not a grant of a right, but one expressly reserved to the people when the Bill of Rights was made a part of the constitution. The Labor Peace Act recognizes this basic fundamental right.

We conclude that the trial court erred in granting the injunction under the facts as disclosed by the record. The judgment is, therefore, reversed and the cause remanded with directions to vacate the order granting the injunction.